**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IMAGECUBE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 04-CV-7587 |
| | ) | |
| THE BOEING COMPANY | ) | Judge Robert M. Dow, Jr. |
| MTS SYSTEMS CORPORATION, and | ) | |
| AEROMET CORPORATION | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this action, Plaintiff ImageCube LLC ("ImageCube") alleges that Aeromet Corporation ("Aeromet"), MTS Systems Corporation ("MTS"), and The Boeing Company ("Boeing") (collectively "Defendants") infringed its United States Patent No. Re. 37,875 ("the '875 patent") for "Solid Imaging Process Using Component Homogenization." For the reasons set forth below, Defendant Aeromet Corporation's motion for partial summary judgment [96] is granted.

**I.    Background**

To understand the Court's framing and disposition of the issues in the pending motion, it is necessary to recap how this case has reached its current posture. This matter initially was assigned to Judge Zagel. Although formal discovery was stayed in May of 2005, Judge Zagel permitted limited discovery on issues related to damages. In addition, in April 2006, Judge Zagel issued a claim construction opinion defining the term "homogenization." Over the next year, there were several disputes regarding discovery and overtures toward settlement or mediation, but no resolution.

In April of 2007, the case began to move more quickly.  On April 18, 2007, Aeromet served on ImageCube, but did not file,[1] a motion for partial summary judgment.[2]  That motion asserted three bases for noninfringement of the '875 patent: (i) Aeromet did not "homogenize" "at least two components" when it used a "single powdered alloy"; (ii) Aeromet's process did not include pre-placing a layer of material on the substrate; and (iii) Aeromet did not apply imagewise radiation.  Between April 18, 2007 and late May 2007, the parties discussed discovery that ImageCube would require to respond to Aeromet's motion and the amount of time that the anticipated discovery would take.  Despite those discussions, ImageCube filed a motion pursuant to Fed. R. Civ. P. 56(f) seeking further discovery, and noticed it for May 29, 2007.  However, ImageCube withdrew that motion[3] and filed a response to the motion for partial summary judgment on May 31, 2007.  Aeromet filed its reply brief on June 13, 2007.

Although the motion was fully briefed at that point, ImageCube filed another Fed. R. Civ. P. 56(f) motion on June 27, 2007, to which Aeromet responded on July 10, 2007.  At a hearing on that motion on July 20, 2007, Plaintiff's counsel stated that "the single powder can, indeed, infringe and the argument is technical, but that's one of the reasons I need discovery."   Judge Zagel responded as follows:

> I did look at the summary judgment motion.  It's correctly categorized as partial summary judgment motion designed to eliminate from the case single powdered alloys, which, whatever way decided, would be useful to the litigation in the case, and, in that respect, I view the summary judgment motion as relatively narrow. But what [Plaintiff's counsel] just said is basically from their perspective they

---

[1] The motion first appears on the docket on June 13, 2007 – the same day that Aeromet filed its reply brief.

[2] Aeromet acknowledges that even if this motion is granted, a small percentage of Aeromet's sales would remain in issue, and thus a live dispute would remain.

[3] Plaintiff's counsel represented to this Court at a hearing in July 2008 that the motion was withdrawn in error.

> think they still have you even if it is a single powdered alloy.  And if that's case,
> then that's the issue that ought to be addressed first.

Judge Zagel then requested that the parties file letters to clarify "why you think there's a live factual issue, underlying factual issue, with respect to single powdered alloy" and why further discovery therefore was necessary on that issue.  Despite the discussion on July 20, 2007, suggesting that ImageCube's 56(f) motion was denied or at least continued, the docket entry stated that the motion was granted.

The parties submitted the requested letters directly to chambers and a further hearing was scheduled for August 10, 2007 to discuss their respective positions.  At the close of that hearing, Judge Zagel stated:  "I don't see any need for discovery."  He did, however, permit ImageCube to file a supplemental response to Aeromet's motion for partial summary judgment.  At the same status hearing, the parties brought up the docket entry "granting" the Rule 56(f) motion and Plaintiff's counsel stated "I'm not going to pursue discovery now in light of your earlier remark." After ImageCube filed its supplemental response and Aeromet filed its supplemental reply, the case was reassigned to this Court's initial docket.  Since that time, the Court has held a lengthy oral argument and requested supplemental briefing on the construction of a key term.

On the basis of the foregoing chronology of events, it appears that after receiving the letters on whether a live factual issue existed, Judge Zagel determined that Aeromet's first argument – that irradiation of a single powdered alloy cannot infringe the '875 patent – could be resolved on summary judgment without discovery, while the second and third arguments required information about Aeromet's process as to which discovery may have proven helpful. This Court therefore construes Judge Zagel's orders as denying ImageCube's Fed. R. Civ. P. 56(f) motion, but limiting the partial summary judgment motion to the issue of "single powdered alloys."  That understanding not only is consistent with Judge Zagel's statements, but also

apparently with ImageCube's reading of Judge Zagel's rulings, because its supplemental response to Aeromet's motion for summary judgment focused solely on that issue. Accordingly, the sole question before the Court on this motion is whether Aeromet's use of "single powdered alloys" can infringe the '875 patent.

## II.    Summary judgment standards

The Court takes the relevant facts from the parties' respective Local Rule ("L.R.") 56.1 statements.[4]  The Court takes no position on whose version of disputed factual matters is correct. L.R. 56.1 requires that statements of facts contain allegations of material fact, and that the factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. See*, e.g., Koszola v. Bd. of Educ. of the City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon,* 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)).

Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. See*, e.g., Malec,* 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. See L.R. 56.1(a), (b)(3)(B); see also *Malec,* 191 F.R.D. at 584. The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). Finally, the Court disregards any additional

---

[4]  See [98] Defendants' Local Rule 56.1(a)(3) Statement of Facts ("Def. SOF"); [95] Plaintiff's Response to Defendants' Statements of Facts; [95] Plaintiff's 56.1(b)(3)(C) Statement of Additional Facts ("Pl. SOF"); and [102] Defendants' Response to Plaintiff's Statement of Additional Facts.

statements of fact contained in a party's response rather than in its statement of additional facts. See, *e.g., Malec,* 191 F.R.D. at 584 (citing *Midwest Imports,* 71 F.3d at 1317).

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252. Finally, "[b]ecause the ultimate burden of proving infringement rests with the patentee, an accused infringer seeking summary judgment of noninfringement may meet its initial burden

either by providing evidence that would preclude a finding of infringement, or by showing that the evidence fails to establish a material issue of fact essential to the patentee's case." *Cannon Rubber Ltd. v. First Years Inc.*, 2004 WL 2533720, at *2 (N.D. Ill. Sep. 28, 2004) (citing *Vivid Tech., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 807 (Fed. Cir. 1999)).

## III.   Facts

ImageCube is a Delaware limited liability company that owns the '875 patent.  Def. SOF ¶ 1.  Defendant MTS is a Minnesota corporation that specializes in providing testing systems to various groups including aerospace, civil engineering, and biomedical industries.  *Id*. at ¶ 2. Defendant Aeromet was a wholly owned subsidiary of MTS formed for the purpose of developing a laser assisted manufacturing business.  *Id*. at ¶ 2-3.  It is now defunct, having gone out of business in 2005.  *Id*. at ¶¶ 8, 15.[5]

In laser assisted manufacturing, a powdered material is subjected to radiation from a laser, which causes the powdered material to form a solid part.  Def. SOF ¶ 3.  Aeromet used this laser assisted manufacturing business to make metal parts for airplanes, some of which were supplied to Defendant Boeing.  *Id*.  Boeing is a publicly traded manufacturer of airplanes headquartered in Chicago.  *Id*. at ¶ 4.  An undetermined percentage of Aeromet's products were made with an alloy composed of titanium with 6% aluminum and 4% vanadium ("Ti-6-4").  *Id*. at ¶ 10.  In making Ti-6-4 products, Aeromet began with a Ti-6-4 substrate and Ti-6-4 powder, and ended with a product composed only of Ti-6-4.  *Id*. at ¶¶ 11, 13.

---

[5] Many of Aeromet's statements of fact are premised on a Declaration of Duane Tinderholm.  Plaintiff objected to the declaration on the basis that "Mr. Tinderholm's statement is unverified because it does not comply with 28 U.S.C. § 1746, and was not notarized.  It therefore lacks indicia of reliability, is hearsay, and cannot establish undisputed facts."  The Seventh Circuit has not required a notarial seal as long as the declaration at issue is made under penalty of perjury.  See *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985).  Aeromet subsequently provided a declaration by Mr. Tinderholm, dated June 12, 2007, that was made under penalty of perjury [103].

**IV.    Analysis**

ImageCube contends that Aeromet's laser assisted manufacturing process infringes ImageCube's patent teaching the same method.  Infringement of a method claim "occurs when a party performs all of the steps of the process."  *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379 (Fed. Cir. 2007).  Infringement analysis requires that the Court first construe the patent claims at issue to determine their scope.  See *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc).  Claim construction presents a question of law.  See *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  Once the scope of the claims is defined, the claims must be compared to the accused device or process.  See *Cybor Corp.*, 138 F.3d at 1454.  That determination involves questions of fact and therefore, on summary judgment, the question is whether there is no genuine issue of material fact regarding infringement.  See *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

ImageCube has asserted that Aeromet infringes independent claims 1, 25, 32, 34, and 51 of the '875 patent, and certain claims that depend from those independent claims.  Aeromet maintains that its process does not perform the steps taught in the '875 patent that require "homogenization" when it radiates "single powdered alloys."  Because all of the asserted claims, with the exception of claim 51, specify "homogenization," Aeromet concludes its process cannot infringe those claims.  The Court previously construed "homogenization" as "the formation of an alloy between substances, and in the case of the homogenization of metals and ceramics requiring the intimate mixing of at least two components to form an alloy between the components, but excluding polymerization techniques when the substances to be homogenized consist of polymers."  See Mem. Op., April 17, 2006, pg.7.  ImageCube's central contention is

that different "phases" of Ti-6-4 could be considered "components" within the meaning of the '875 patent and thus Aeromet did "homogenize" when it irradiated Ti-6-4. The Court could not resolve that question without first determining the scope of "components." Therefore the Court requested, and the parties submitted, supplemental briefing on the proper construction of that term.

ImageCube has pointed out that "component" is contained in only three of the five independent claims at issue: 1, 25, and 34. Independent claim 32, and dependent claim 33, do not use "components" but instead refer to "providing a layer of composition." As discussed at the conclusion of the opinion, that distinction does not take those claims outside the scope of this summary judgment motion. Claim 51, remains unaffected by this motion.

### A.      Principles of claim construction

Claim construction is a matter of law for the court to decide. See *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). Courts should look first to the intrinsic evidence of the patent – the claims, the specification, and the prosecution history if it is in evidence. See *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). When the intrinsic evidence unambiguously describes the scope of the patented invention, reliance on extrinsic evidence is improper. See *id.* at 1583. Claim interpretation begins with the actual words of the claims which are "generally given their ordinary and customary meaning." *Vitronics Corp.*, 90 F.3d at 1582. This is an objective inquiry of what one of ordinary skill in the art at the time of invention would have understood the term to mean. See *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). The presumption in favor of the ordinary meaning may be overcome when the patentee "clearly set[s] forth a definition for a claim term in the specification." *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306 (Fed.

Cir. 2003) (citation omitted).   The person of ordinary skill in the art is deemed to read the claim term, not only in the context of the applicable claim but in the context of the entire patent, including the specification.   See *Phillips*, 415 F.3d at 1313-1314.   In fact, the specification "is always highly relevant to the claim construction analysis.   Usually it is dispositive; it is the single best guide to the meaning of a disputed term."   *Vitronics*, 90 F.3d at 1582; see also *Metabolite Labs., Inc. v. Lab. Corp. of America Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004) ("In most cases, the best source of discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention").   However, the claims are not limited to the embodiments shown in the specification.   See *Anchor Wall Sys., Inc.*, 340 F.3d at 1307; see also *Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments").   In addition, the court will not import limitations from the specifications into the claims.   See *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005) (citing *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002)).   Nevertheless, if it is clear from the specification "that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims in the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question."   *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001).

In addition to the claim language and specification, the prosecution history before the United States Patent and Trademark Office ("PTO") also is considered intrinsic evidence of the proper construction.   "The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'"   *Chimie v. PPG Indus.,*

*Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (quoting *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580 (Fed. Cir. 1988)).   However, "unless altering claim language to escape an examiner rejection, a patent applicant only limits claims during prosecution by clearly disavowing claim coverage."  *Kopykake Enters., Inc. v. Lucks Co.*, 264 F.3d 1377, 1382 (Fed. Cir. 2001) (internal quotation and citation omitted).

District courts also are authorized to rely on extrinsic evidence, including expert and inventor testimony, dictionaries and learned treatises.  See *Phillips*, 415 F.3d at 1317 (citations omitted).  Extrinsic evidence "may be considered if the court deems it helpful in determining 'the true meaning of language used in the patent claims.'"  *Id.* (quoting *Markman*, 52 F.3d at 980). For example, technical dictionaries and treatises may enable the court to understand the way in which one of skill in the art might use the claim term.  See *id.* at 1318.  Expert testimony can be useful "to provide background on the technology at issue" and to "ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field."  *Id.* (citations omitted).

At the same time, courts must bear in mind the limitations on the utility of extrinsic evidence in claim construction.  As the Federal Circuit has explained, extrinsic evidence may be less reliable for several reasons:  expert reports and testimony are generated for litigation and can suffer from bias; the "virtually unbounded universe of potential extrinsic evidence of some marginal relevance that could be brought to bear on any claim construction question; and extrinsic evidence could "change the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification and the prosecution history, thereby undermining the public notice function of patents."  *Phillips*, 415 F.3d at 1318-1319 (internal

citations omitted).  In addition, "conclusory, unsupported assertions as to the definition of a claim term are not useful to a court" and "a court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'" *Id*. (quoting *Key Pharms. v. Hercon Labs. Corp.*. 161 F.3d 709, 716 (Fed. Cir. 1998)).  In sum, extrinsic evidence may be considered in the district court's discretion, but it must be viewed in light of the intrinsic evidence and the potential shortcomings noted above.

### B.    Application of claim construction principles

#### 1.    "component"

The claims at issue, excepting claims 32 and 33, teach providing a "dispersion containing components A and B" and exposing that dispersion to radiation to form an alloy.  Aeromet argues in its summary judgment motion that it did not infringe the '875 patent when it used Ti-6-4 and other "single powdered alloys" because those alloys do not contain the required "components."  ImageCube responds that Ti-6-4 does contain the necessary "components" in the form of alpha and beta "phases" and thus even the irradiation of single powdered alloys infringes its patent.  The parties are well aware that the construction of "components" bears significantly on the disposition of the summary judgment motion and the proposed definitions are framed accordingly.  However, the Court is equally aware that it cannot construe claims with reference to the accused device or process (see *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985)) and therefore will disregard Aeromet's process when construing "components."

ImageCube explicitly includes "phase" in its otherwise broad construction of "components" as "*a metal, polymer or ceramic, or a combination of any of the foregoing,*

*including an alloy, in liquid, solid, gas, or particulate form, such as a phase.   When two components are present, they must differ in some physical or chemical property.*"   Aeromet asks the Court to define "components" more narrowly as "*discrete polymers, metals, ceramics, or combinations of these materials, that are present in a dispersion, that are capable of forming an alloy upon exposure to radiation, and that are not already alloyed with one another.*"

Both parties propose that "components" include "polymers, metals, ceramics, or combinations of these materials."   That language is supported by the patent and will be adopted.   See, *e.g.*, '875 Patent, Col. 17, ll. 12-13; Col. 2, ll. 23-24.   However, there is no reason to include the superfluous language that they can "include an alloy" when that possibility is encompassed by "combinations of these materials."   The second half of ImageCube's proposed first sentence was slightly altered between its opening and response brief.   It originally stated that a "component" could be "in liquid, solid, or particulate form."   ImageCube cites to examples in the patent where "components" take these forms and Aeromet did not object.   See id., Col. 17, ll. 25-28.   However, in its reply brief, ImageCube added "gas" to this list.   Aeromet was not given an opportunity to respond to this change.   And, equally important, ImageCube does not indicate where the patent teaches "components" in gaseous form.   Therefore, only the original statement that the listed materials can be in "liquid, solid or particulate form" will be included in the definition.   Before proceeding, it is important to note that the second part of ImageCube's proposed first sentence depends on the first.   In other words, "components" must first be a metal, polymer, ceramic, or alloy of those materials - liquid, solid and particulate are merely forms that those materials can take.

Aeromet objects to the explicit reference to "phase" in the definition, but ImageCube argues that one skilled in the art would understand "components" to include "phases" and

submits that both the intrinsic and extrinsic record support that contention. Whether a "component" encompasses "phases" can be more effectively and efficiently addressed once the proper boundaries of "component" are defined.[6] Therefore, the Court will address the remainder of the parties' construction arguments before turning to the specific question of "phases."

The second half of ImageCube's proposed definition would require "components" to possess different chemical or physical properties from each other. The patent does contain dependent claims that teach "components" with different melting points (claim 16) and a process where one of the "components" is in an above solidus state (claim 23). '875 Patent, Col. 17, ll. 43-47; Col. 18, ll. 14-16. Although Aeromet does not argue otherwise, it contends that differences in physical and/or chemical properties are insufficient as the sole basis for defining "component." A quick glance at the first sentence of ImageCube's proposed construction reveals the Aeromet is correct – more is required. The claims cited by ImageCube further support that conclusion. Claim 16 teaches the "process as claimed in claim 1, wherein component A has melting point MpA, component B has a melting point MpB, and MpA is higher than MpB, and wherein homogenization forms an alloy having an euctetic which is different from MpB." *Id.*, Col. 17, ll.43-47. Compare that language to claim 4, which teaches the "process as claimed in claim 1, wherein components A and B *are* polymers, metals or ceramics." *Id.*, Col. 17, ll. 12-13 (emphasis added). While claim 4 describes what "components" are, claim 16 describes characteristics of the permissible "components." As a final note, the '875 patent is concerned more with differences between the components that make up the dispersion and the alloy formed from those components, not the distinction between the components themselves. Nonetheless,

---

[6] It is unclear to the Court, and neither party makes a point of distinguishing, whether the "phase" question should be addressed as a claim construction question or whether, once construed, the Court should determine whether "phase" is encompassed within that definition. The issue is further confused by ImageCube's inclusion of "phase" in its proposed definition. The issue ultimately is irrelevant because ImageCube's argument fails either way.

the Court agrees that "components" must "differ in some chemical or physical property" as it is supported by the above claim language and the repeated use of A and B signifying a difference between "components." To determine whether additional limitations are proper, the Court turns to Aeromet's proposed definition.

ImageCube does not contest the proposition that "components" must be "present in a dispersion" (see, *e.g.*, '875 Patent, Col. 16, ll. 60-63) or that they must be "capable of forming an alloy upon exposure to radiation" (see, *e.g.*, *id.*, Col. 16, ll. 58-67; Col. 17, ll. 1-5). Therefore, as it currently stands, a "component" is a "polymer, metal, ceramic or combination of those materials; in liquid, solid, or particulate form; that differs in some chemical or physical property from the other component(s) present in the dispersion; and is capable of forming an alloy upon exposure to radiation." The dispute can be narrowly focused – disregarding the specific "phase" question for now – to the question of whether "components" have to be "discrete" materials and are precluded from being "already alloyed with one another."

### 2.    "not already alloyed with one another"

As always, claim interpretation begins with the actual words of the claims. *Bell Commc'ns. Research v. Vitalink Commc'ns. Corp.*, 55 F.3d 615, 619-620 (Fed. Cir. 1995). Claim 1, which is similar to the other claims at issues, excluding claims 32-33, teaches:

> A process for producing a homogenized, three dimensional, integral object by imagewise thermal radiation of a dispersion, the dispersion containing components A and B, comprising the steps of:
>
>> a) providing the dispersion containing components A and B;
>> b) forming the dispersion into a layer;
>> c) homogenizing the dispersion by applying imagewise thermal radiation to form an alloy of components A and B; * * *

'875 Patent, Col. 16, ll.58-67. Under the ordinary meaning of that language, one starts with two things (A and B) and through the process of thermal radiation, creates a third (the alloy). If that

is the proper reading, the components cannot be previously alloyed; if they were, then no alloy would be "formed."   However, the Court is not the intended audience and the Court must determine how one skilled in the art would read this claim.   ImageCube has not presented any evidence that one skilled in the art would read it any other way.[7]

Aeromet argues that absent the limitation noted above, the patent claims would teach a process in which there is no difference between the dispersion and the completed alloy – the process could begin and end with the same alloy.   And if that were the case, so the argument goes, then no alloy would be "formed" as the claims requires.   ImageCube responds that the patent does not require that a *new* alloy be formed.   According to ImageCube, alloy formation merely requires changes in physical or chemical properties subsequent to radiation.   That interpretation rests on language in the specification stating that "the alloyed (homogenized) material has a different melting point than the dispersion of components A and B, and thus, the alloyed three-dimensional article can be separated from the surrounding dispersion based on the difference in melting point."   '875 Patent, Col. 3, ll. 3-7.[8]   However, the sentence preceding that embodiment reveals that the difference in melting point permitting separation is founded on the distinction between non-alloyed and alloyed. See *id.*, Col. 2, ll. 66-67; Col. 3, ll. 1-2 (the "difference in properties of the alloy is preferably sufficient in itself to permit separation of the alloyed components from non-alloyed, surrounding regions of the dispersed components following imagewise exposure").   The difference in melting points thus is the *result* of the distinction between the non-alloyed region and the alloyed components.   The melting point

---

[7] ImageCube reserves its "one skilled in the art" argument for the question of whether "phases" are "components."

[8] ImageCube also points to this line in the specification to argue that the patent provides examples supportive of its position that the dispersion can be distinguished from the end product, not solely on the basis of unalloyed versus alloyed, but also through changes in properties.   The Court rejects the argument in that context for the same reason.

change is simply a characteristic of the alloyed material – the patent still requires the formation of an alloy that is distinct from the "non-alloyed" material.

Following the same line of argument that forming an alloy merely requires a change in properties, ImageCube cites the specification which states that "[t]he components A and B are capable of alloying, when exposed to imagewise radiation, to form an alloy of the two components A and B which is characterized by physical and/or chemical properties which are distinct from the physical and/or chemical properties of the dispersion of components A and B." '875 Patent, Col. 2, ll. 24-29.  ImageCube's example fails to persuade the Court. The patent teaches that (a) an alloy be formed, and (b) the alloy possess attendant changes in physical or chemical properties.   Simply because the second step is met does not mean that an alloy necessarily has been formed.  By focusing on the results of irradiation, ImageCube reads out the step required to get to those results.  It may be true that irradiation of a single material, without introducing a second "component," may alter the material's properties.   But that is not the process that the patent teaches.  If the same alloy exists before and after applying radiation, nothing has been *formed* – at most, the alloy has been altered.  ImageCube's interpretation would expand the patent to cover a dispersion with only one "component" as long as irradiation of that single "component" resulted in a change in some property of that material.  The Court cannot so easily read out the requirements that (a) an alloy be formed (b) by using two "components."  The Court concludes that the claim language supports a construction that the "components" constituting the dispersion cannot be alloyed prior to homogenization.

That conclusion also is convincingly supported by the specification which draws a distinction between the "unalloyed" dispersion (containing the "components") not treated by the laser and the resultant homogenized alloy formed upon subjection to radiation.  Specifically, the

patent includes statements that "the alloy of A and B should preferably be separable from the *unalloyed dispersion of A and B* based on the difference in physical and/or chemical properties" '875 Patent, Col. 3, ll. 24-26 (emphasis added), and "[t]he difference in properties of *the alloy* is preferably sufficient in itself to permit separation of the alloyed components from *non-alloyed, surrounding regions of the dispersed components* following imagewise exposure" *Id*., Col. 2, ll. 66-67 and Col. 3, ll. 1-2 (emphasis added).  Those statements certainly suggest that only through the imagewise radiation of the dispersion do the "components" become alloyed – and therefore they cannot be alloyed prior to radiation.

ImageCube counters that Aeromet fails to read the specification as a whole.  According to ImageCube, when viewed in context, the portion of the specification on which Aeromet relies requires "components" A and B to satisfy three conditions, none of which is that they be unalloyed with each other:

> Choice of the particular material combinations to be used depends on the nature and intended us[e] of the three-dimensional part or object being produced.  From within these classes of materials, the components A and B should be selected so as to be: capable of alloying under the exposure of imagewise radiation within a practical range of intensity; the alloy must have physical and/or chemical properties distinct from the properties of an intimate dispersion of A in B or B in A; and the alloy of A and B should preferably be separable from unalloyed dispersion of A and B based on the difference in physical and/or chemical properties.

'875 Patent, Col. 3, ll. 16-26.  However, ImageCube does not say what three conditions should be gleaned from this section.  As the Court reads it, there actually are two statements requiring that the "components" be unalloyed with each other before the laser is applied.  First, they must be capable of alloying, which, as discussed above, suggests that they cannot previously have been alloyed.  Second, and more importantly, the "context" of the preceding sentences does nothing to diminish the fact that the patent distinguishes the unalloyed dispersion from the alloy

formed by imagewise radiation.   ImageCube persists that the use of "preferably" in the last sentence acts as a qualifier that "provides latitude."   But even if that were the case, "preferably" is used in reference to the separability of the alloy.   The distinction between unalloyed and alloyed exists regardless of the preferred separability.   ImageCube's concluding statement that "preferably unalloyed" is not limiting is a red herring; that phrase does not appear in the patent.

Aeromet's proposed limitation also is consistent with the embodiments contained in the '875 patent.   Despite the numerous examples provided in the specification, nowhere does the patent teach the inclusion of an alloy in the dispersion unless a separate material is introduced prior to irradiation.   When the patent provides examples in which alloys act as a "component," it is merely one "component" of the dispersion.   ImageCube itself states that "the defendants agree that a 'component' can itself be an alloy, and that this alloy can be combined, *with another component*, into *still another alloy*."   ImageCube's Memo. Re Component [172] at 4. (emphasis added).    The patent provides an example of powdered aluminum, S(A), dispersed with an alloy of gallium and aluminum, A1B1, to form a different alloy of A2B2. '875 Patent, Col. 6, ll. 25-41.   The irradiation process always results in the formation of a third object.   The Court is aware that it cannot necessarily limit claims to the embodiments contained in the specification.   See *Phillips*, 415 F.3d at 1323.   However, the examples in the patent merely buttress the claim language and the remainder of the specification discussed above and therefore provide further support for the Court's conclusion that a new alloy must be formed.   And because a new alloy must be formed, the components cannot be alloyed with other prior to homogenization.

Finally, ImageCube argues that even if its other arguments fail and an express description is required, the patent does specify the use of pre-alloyed "components."   In support of that contention, ImageCube looks to the following language:

> Furthermore, the liquid phase need not be comprised of a pure component B or a pure component A.  The liquid phase may be comprised of, for example, an alloy of component A and component B at a euctetic point such that upon heating above the euctetic isothermal line EuB temperature the liquid phase does not have crystalline components AB or β.  Such a condition ensures a greater amount of liquid to solid particle ratio and also reduces the amount of homogenization required to change the composition to a higher melting alloy.

'875 Patent, Col. 11, ll.37-46.  But when read in the context of the embodiment, that passage does not support ImageCube's position.  The embodiment begins with the addition of a material "component" A to a liquid phase "component" (L)A1B1.  *Id.*, Col. 10, ll. 35-38.  A new alloy of (S)A2B2 is then formed where the component A is placed.  *Id.*, ll. 39-41.  Therefore, when the specification later states that the (L)A1B1 can be an alloy, there still is another "component" added, material "component" A, prior to homogenization.  As the language cited by ImageCube states, "[s]uch a condition ensures a greater amount of liquid to solid particle ratio * * *" (*id.*, ll.43-44) – the liquid being (L)A1B1 and the solid being material "component" A.  This example does not teach homogenizing an alloy alone and the Court comes to the same conclusion – the "components" cannot be alloyed prior to irradiation.

3.   **"discrete"**

The parties agree that, given the A and B nomenclature employed to identify them and other references throughout the patent, the "components" must differ from each other in some way.  However, the parties disagree on whether they need to be "discrete" – that is, different – *materials*.  The use of A and B to distinguish components does not necessarily require that result – it simply requires that two (of something) exist and that they differ in some regard.  In the same vein, the references to "individual" "components" are not necessarily determinative.

Again, we begin with the claim language, which states that "components A and B are polymers, metals or ceramics."  '875 patent, Col. 17, ll. 12-13.  Those are all individual, discrete,

19

materials.  Nothing in the patent claims suggests that a component can be any division or subset

of a material or anything non-material.  That reading is borne out by the specification, which

similarly limits its discussion of components to discrete materials.  The "Summary of the

Invention" states that "Components A and B may be polymers, metals, ceramics, or

combinations of these materials."  Col. 2, ll. 23-24.  In reality, whether it is implied that the

"components" be different materials or explicitly spelled out in the definition ultimately is of no

consequence.

ImageCube advances several arguments in support of its view that components are not

limited to polymers, metals, ceramics, or "materials" generally.  Initially, ImageCube maintains

that "components" cannot be limited to the listed materials because of the inclusion of "may be."

The Court disagrees and interprets "may be" not to expand upon the universe of materials that

may comprise a component, but simply to indicate that a component could be any one of those

materials, alone or alloyed.[9]  ImageCube's interpretation would improperly expand the scope of

the patent.  Every example contained in the patent teaches a dispersion of at least two discrete

materials.  At no point does the specification describe irradiating an alloy alone, much less

suggest that doing so would satisfy the requirement that two "components" be homogenized.  In

those instances where one of the "components" is an alloy, there always is a separate discrete

"component" added to the dispersion.  See Patent '875, Col. 6, ll. 25-27 (50 parts of component

B (Alloy A1B1 containing 30% gallium and 70 % aluminum) 50 parts of solid component A

(powdered aluminum)).  Again, the Court is aware that it cannot necessarily limit claims to the

embodiments.  See *Phillips*, 415 F.3d at 1323.  Yet, examples constitute further evidence that the

patent only disclosed material "components."

---

[9] This actually is consistent with ImageCube's brief which, after suggesting that "may be" requires that
"components" not be limited to the listed materials, provides a list of all possible combinations of
components and only references those materials.

Beyond the claim terms and summary of the invention, which limit "components" to the listed materials that happen to be "discrete," there are other helpful clues to meaning in the patent itself.  The formation of an alloy is described as taking place "between the *substances* which are homogenized."  Col. 2, ll. 59-66 (emphasis added).  Although "substances" are not explicitly equated with "components," that result can be easily derived.  The patent teaches a process of homogenizing a dispersion; the dispersion contains "components" A and B; therefore, the "substances which are homogenized" must be "components."  The "components" in the dispersion also are described as different "material combination[s]," the selection of different combinations governed by the intended use of the object being produced (*Id.*, Col. 3, ll. 16-17), and "material pairs" (*Id.*, Col. 5, ll. 6).

ImageCube maintains that there is no requirement that each "component" consist of only one material.  To the extent that the patent permits alloys and polymers to act as "components," ImageCube is correct.  However, to the extent ImageCube argues that a single material can contain the sufficient "components," the Court must disagree.  ImageCube contends that because Example 1 of the specification includes three materials – polyethylene oxide, trimethylolpropane triacrylate and graphite – there is no one-to-one "material" to "component" requirement.  It is unclear how this example supports ImageCube's position.  To the extent that ImageCube believes that these three materials are one "component," ImageCube's reading is incorrect.  They are three separate materials mixed in the dispersion and constituting individual components.  And that example is entirely consistent with the requirement that "components" be discrete materials of the metal, ceramic, polymer or combination thereof variety.

Finally, and related to the previous limitation, the patent only encompasses "components" that are capable of forming an alloy with each other and eventually are alloyed through the

homogenization process.   ImageCube does not suggest that non-material or non-discrete "components" would be capable of forming a new alloy.  As discussed above, a mere change in properties of an existing alloy is not the "formation of an alloy" as taught by the patent, which is one final reason to permit the limitation that the "components" be discrete.

In short, ImageCube argues that the construction should not include "discrete," "not already alloyed with one another," or any other language that is not contained in the claims. However, "in clarifying the meaning of claim terms, courts are free to use words that do not appear in the claim so long as the resulting claim interpretation * * * accord[s] with the words chosen by the patentee to stake out the boundary of the claimed property."  *Pause Tech. LLC v. Tivo Inc.*, 419 F.3d 1326, 1333 (Fed. Cir. 2005) (internal quotations omitted).  Both limitations are supported by the words chosen by the patentee in setting the borders of the invention. Therefore, the Court construes "component" as a "discrete polymer, metal, ceramic or combination of those materials; in liquid, solid, or particulate form; that differs in some chemical or physical property from the other component(s) present in the dispersion; is capable of forming an alloy upon exposure to radiation; and is not already alloyed with the other component(s)."

### d.      Are "phases" "components"?

The inquiry into whether "phases" are "components" must begin with the recognition that the patent does not directly state that "components" can include "phases" – as it expressly does for polymers, metals and ceramics.  In fact, the only mention of phases in the patent is in reference to a completed alloy.  See '875 Patent, Col. 4, ll. 30-33 ("It should be noted that homogenization does not require complete mixing.  It is recognized, for example, that solidified alloys may contain crystals or phases of varying composition").  ImageCube acknowledges this fact and makes two arguments for its inclusion – first, there was no need to include phases

specifically because one skilled in the art would understand that "phases" can be "components" and second, "phases" fall within the definition of "components" that ImageCube proposed.  The Court will address these arguments in reverse order.

ImageCube notes numerous property differences between the alpha and beta phases of Ti-6-4 and alpha and beta phases generally.  It then asserts that "[e]ach phase can be a solid or a liquid, depending on the temperature. * * *.  The physical or chemical properties of each phase differ from the properties of another phase.  A component therefore cannot be construed to exclude a phase."[10]  If viewed within the boundaries of the construction adopted by the Court, a "phase" certainly can be excluded from the umbra of "components."

ImageCube's argument for encompassing "phases" is contrary to the Court's construction of a "component" as one of, or a combination of, a metal, ceramic, or polymer.  ImageCube does not argue that "phases" fall into any of those categories.  Instead, ImageCube argues that "phases" need not fit within those categories, a position that the Court has rejected.  The Court also has rejected ImageCube's contention that no new alloy need be formed and that a change in some property of the "component" is all that the patent requires when it teaches forming an alloy.  Differences between "phases" of an alloy are simply irrelevant if the other requirements of a "component" are not met – and they are not met by "phases."

This "change in property" as a basis for "component" argument appears to provide the foundation for ImageCube's analogy to $H_2O$.  Beyond a basic tutorial in how the same elements can align themselves in different ways and exist in different states, it is not clear how this example is applicable to the '875 patent or would support the notion that "phases" can be "components."  To the extent that ImageCube seeks to argue that because (a) components" can

---

[10] ImageCube also states "[e]ach phase has at least one metal" but there is no citation to the record to support that statement.  See [172], pg. 6.

exist in different states and (b) "phases" exist in different states, therefore (c) "phases" can be "components," the Court already has concluded that different states do not a component make. The component first must satisfy the requirement that it be a metal, polymer, ceramic, or alloy of those materials. If that requirement is met, then the "components" may exist in different forms including solid, liquid and particulate. And to the extent that ImageCube references its water analogy to argue that changes can occur in both "phases" and "components," the Court notes that "homogenization" as it used in the patent means something specific – "formation of an alloy." Water does not form an alloy when it changes states from solid to liquid and to gas.

Perhaps recognizing that the most natural construction of "components" would preclude "phases" of an alloy, ImageCube argues that one skilled in the art would understand otherwise. In support, ImageCube cites several extrinsic references, including the inventor's declaration and a various assortment of definitions and advertisements. Because the Court finds that the intrinsic evidence unambiguously describes the scope of the patented invention, it would be improper to proceed to the extrinsic evidence. See *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). However, for the sake of completeness, the Court will address the extrinsic evidence.

ImageCube cites two definitions of "phase" from the same dictionary. One definition provides that a "phase" is one of the three states or conditions in which a substance can exist – solid, liquid, or gas. *Hawley's Condensed Chemical Dictionary*, 11th ed. The other states it is:

> A physically distinct and mechanically separable portion of a dispersion or solution. Phases may be either solid, liquid, or gaseous (vapor). In any mixture or solution the major component is called the continuous or external phase, and the minor component the dispersed or internal phase. The latter may or may not be uniformly dispersed in the continuous phase.

*Id*.  From those definitions, ImageCube argues that a "phase" can be both a "component" and part of a dispersion. Although the second definition uses "component" and "dispersed," it still is not clear that "component" is being used in the same sense as in the patent.  "The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of the words rather than on the meaning of claim terms within the context of the patent."  *Phillips*, 415 F.3d at 1321; see also *Cabell v. Markham*, 148 F.2d 737, 739 (L. Hand, J.) ("But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of a dictionary * * *").  The Federal Circuit also has voiced concern that it often is possible to find extrinsic evidence of at least some marginal relevance that might support either side's position (or both sides' positions).  See *Phillips*, 415 F.3d at 1318.

Those concerns are validated in this case, for Aeromet has countered with a quotation that differentiates "components" and "phases": "The substances in alloys might be two metals * * * or several metals, such as aluminum, magnesium, and manganese.  These substances constitute the components comprising the system and should not be confused with the various phases found within the system."  "Introduction to Alloy Phase Diagrams", Baker, Ed., Section 1 of *ASM Metals Reference Book*, ASM Int'l, Materials Park, OH (1993).  ImageCube replies by rephrasing the reference to say that "'substances' should not be confused with 'phases'" and therefore it "does not preclude a component from being a phase."

If read correctly, and substances and components are equated, the reference explicitly precludes a "component" from being a "phase."   But the larger point illustrated by the dualing dictionary definitions is that definitions can be found to support both parties' constructions. And, like most extrinsic evidence, those definitions can be unhelpful or even misleading unless they are placed in context – and, even then, often have limited utility where the intrinsic record is

robust.  Here, for the reasons explained above, the Court is not persuaded to deviate from the meaning of "component" established by the ample intrinsic evidence presented by the parties in this case.

In regard to the declarations submitted by Lawton, the Court notes that there certainly are instances where a declaration, even if created during the course of litigation, may be helpful to a proper construction.  For example, in *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716-718 (Fed. Cir. 1999), the Federal Circuit approved the trial court's acceptance of an expert's testimony applying a specific number to the generic claim term "pharmaceutically effective amount."  At the same time, many courts have sounded words of caution when evaluating the "after-the-fact" testimony of the inventor, and have noted that such testimony must be viewed in light of the generally more reliable intrinsic evidence in the case, including the patent disclosure itself.  See, e.g., *Bell & Howell Document Management v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997); *Amazin' Raisins Int'l, Inc. v. Ocean Spray Cranberries, Inc.*, 2007 WL 2386360, at *13 (D. Mass. Aug. 20, 2007).

Aeromet contends that the Court should not give credence to the Lawton declaration at all because it is litigation driven and attempts to impart new meaning that is contrary to the original specification.  While the Court has considered the declaration, it is in some respects "at odds with the claim construction mandated by the claims themselves, [and] the written description * * *, in other words, with the written record of the patent."  *Key Pharms.*, 161 F.3d at 716 (citing *Markman*, 52 F.3d at 981; *Vitronics*, 90 F.3d at 1584).  Moreover, here – in contrast to *Key Pharms.* (see *id*. at 718), there is a substantial amount of intrinsic evidence to aid the Court in defining the pertinent claim terms.  In these circumstances, Lawton's declaration cannot be

given much weight and will not be used to trump the meaning of the terms that is evident from the intrinsic record.

### B.      Infringement

The only basis for partial summary judgment under consideration at this time is that Aeromet did not practice "homogenization" when it employed Ti-6-4 and other single powdered alloys.  "Homogenization" requires the formation of an alloy between two "components."  Here, according to Aeromet, it began and ended with Ti-6-4.  Thus, Aeromet insists that it did not "form an alloy" from "two components" as required by the '875 patent.  ImageCube responds that the use of Ti-6-4, and other single powdered alloys, can infringe the '875 patent because they contain the necessary "components" in the form of "phases" which are "homogenized" through irradiation to form an alloy.  ImageCube argues that Ti-6-4 powder starts as a dispersion of alpha  ("α") phase and beta ("β") phase, goes through "phase changes" as it is heated, and then cools into a solid mostly β phase object.  According to ImageCube, the presence of the α and β phases in Ti-6-4 prior to irradiation satisfies the two "component" requirement.  It further contends that the ultimate phase change, which is manifested through physical and chemical alteration, satisfies the "homogenization" requirement because the finished alloy is "more homogenized."  Aeromet objects that (i) ImageCube's declarant is not qualified to offer such opinions and (ii) even if everything that he says is true, ImageCube's patent still does not read on Aeromet's process.

According to ImageCube's declarant, the α and β phases present in Ti-6-4 are different in several ways:  (i) they have different crystalline structures in which the α phase is hexagonal close-packed ("HCP") and the β phase is body-centered cubic ("BCC"); (ii) they differ in their elemental and chemical compositions, in which vanadium is completely soluble in the β phase of

the powder, while it has limited solubility in the α phase; (iii) the α phase cannot contain 4% vanadium therefore as the α phase forms, vanadium moves from the α phase to the β phase as the heat history of the powder changes; and (iv) the powder α phase and the powder β phase have β transus temperatures that are different from the transus temperature of the homogenized β phase. Because of these differences, ImageCube concludes that the α and β phases of Ti-6-4 are effectively separate components that, once heat treated, become "more homogenized." Expanding this argument beyond Ti-6-4, ImageCube argues that in general the properties of α and β phases are known to be different. While α alloys commonly have creep resistance superior to β alloys, are suitable for somewhat elevated temperature applications, are sometimes used for cryogenic applications, and have adequate strength, toughness, and weldability. In short, α alloys are not as readily forged as many β alloys and cannot be strengthened by heat treatment. In addition, Aeromet notes that β alloys have good forging capability, are prone to a ductile to brittle transition temperature and can be strengthened by heat treatment.

At the end of the day, notwithstanding the litany of differences in the α, β and α-β phases noted by ImageCube, the Court concludes that those phases fail to qualify as "components" under the '875 patent. And in light of the Court's construction of "components" and its determination that "phases" are not "components" within the meaning of the '875 patent, the Court must conclude that Aeromet did not infringe on the ImageCube patents requiring "homogenization" when Aeromet used Ti-6-4 and other single powdered alloys, because the necessary "components" were lacking and therefore no alloy was formed.

Finally, the Court turns to independent claim 32 and dependent claim 33. Claim 32 teaches:

> A method for forming an integral object from a composition in a layer-by-layer process wherein properties within said object are changed, said process

comprising the steps: providing a layer of composition; homogenizing said composition; changing the properties of regions of the layer of composition by exposing the composition to imaging radiation and repeating steps a-b with subsequent applications of composition and exposure, such that a portion of each new imaged composition region becomes integral with the previous imaged composition region to form an integral three dimensional object; wherein the properties within said integral object are changed by varying the imaging radiation time, temperature, and/or intensity.

'875 Patent, Col. 18, ll. 50-65.  ImageCube points out that this claim, and its dependent claim 33,[11] do not include the term "component," and argues that those claims therefore are not encompassed by the summary judgment motion.  Aeromet initially responds that both claims are susceptible to summary judgment because Aeromet did not apply "imaging" radiation and did not pre-place a layer of composition onto a surface.  As discussed above, this summary judgment motion is limited to the "single powdered issue," and therefore these arguments are not before the Court.  Aeromet also maintains that because claims 32 and 33 specify "homogenization" – which has been construed to mean "forming an alloy" (and if metals and ceramics are used, "the intimate mixing of at least two components") – it did not infringe those claims when using Ti-6-4.  Although the issue presents a close call, the Court agrees with Aeromet.

While the term "composition" is not defined explicitly in the claims or the specification, an examination of the use of "composition" in the specification suggests that it is analogous to a "dispersion."  In Example 1 for instance, the patent describes a "dispersion" of 300 grams of crystalline polyethylene oxide, and 700 grams of trimethylolpropane triacrylate.  '875 Patent, Col. 14, ll. 38-41.  Shortly thereafter, the patent states, "[w]hile approximately 7 parts of trimethylolpropane triacrylate to 3 parts of polyethylene oxide were used for making the object in Example 1, greater amounts of polyethylene oxide in a *composition* can be used to make objects which retain some crystallinity * * *."  *Id.*, Col. 15, ll. 11-15 (emphasis added).  The

---

[11] Claim 33 teaches "A method according to claim 32 wherein said imaging radiation is thermal."

patent is discussing the same concept, although in different proportions and using a different term.  See also *id*., Col. 8, ll.  25-27 ("the solid component (S)A, of the composition (L)A1B1 + (S)A, melts forming the composition (L)A1B1 + (L)A.").

The inquiry does not end there.  When "dispersion" is used elsewhere in the claims, it is explicitly defined to contain components A and B.  See, *e.g.*, '875 Patent, Col. 16, ll. 60-61.  No such qualifier exists in claim 32, leaving open the question whether "compositions" necessarily include at least two "components."  However, because claim 32 teaches homogenization of the composition and "homogenization" requires "formation of an alloy" and "the intimate mixing of at least two components" if metals and ceramics are used, the Court concludes that claim 32 also requires two components.  To decide otherwise would read homogenization out of the claim. Because "homogenization" means "forming an alloy," a "composition" cannot consist of a single alloy, and therefore a "composition" must have at least two components which are capable of forming an alloy.  For all the reasons that Ti-6-4 does not infringe the claims explicitly including "components," its use cannot infringe claims 32 and 33 which necessarily implicate "components."

## V.    Conclusion

In sum, as explained above, the Court concludes that because Aeromet's products made with single powdered alloy are beyond the scope of patent claims 1, 25, 32 and 34 and claims dependent therefrom, Defendant's motion for partial summary judgment [96] is granted.

Dated:  July 22, 2009

_____
Robert M. Dow, Jr.
United States District Judge